**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

LEON LESLIE STILSON,

              CASE NO. 5:21-cv-12330
     *Plaintiff*,           DISTRICT JUDGE JUDITH E. LEVY
*v.*                    MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

     *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 14, 16)

## I.    RECOMMENDATION

Considering the entire record in this case, I suggest that substantial evidence supports the Commissioner of Social Security's determination that Plaintiff, Leon Stilson, is not disabled. Accordingly, I recommend that the Court **DENY** Plaintiff's motion for summary judgment, (ECF No. 14), **GRANT** the Commissioner's motion, (ECF No. 16), and affirm the decision.

## II.    REPORT

### A.    Introduction and Procedural History

Plaintiff protectively applied for disability insurance benefits ("DIB") and supplemental security income ("SSI") on May 28, 2019, alleging that he became disabled on March 10, 2019. (ECF No. 12, PageID.308–19). The Social Security

1

Administration denied his claims on December 16, 2019.  (*Id.* at PageID.138–39).

Plaintiff requested a hearing before an ALJ which was held on December 22, 2020.

(*Id.* at PageID.85, 248–49).    The ALJ issued a decision on February 10, 2021,

finding that Plaintiff was not disabled within the meaning of the Social Security Act.

(*Id.* at PageID.79).  The Appeals Council denied review on August 5, 2021. (*Id.* at

PageID.51).

On October 4, 2021, Plaintiff filed a complaint seeking judicial review of the

ALJ's final decision.  (ECF No. 1).  This case was referred to the undersigned on the

same day, and both parties later filed cross-motions for summary judgment.  (ECF

Nos. 3, 14, 16).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final

administrative decision pursuant to 42 U.S.C. § 405(g) (2018).  The district court's

review is restricted solely to determining whether the "Commissioner has failed to

apply the correct legal standard or has made findings of fact unsupported by

substantial evidence in the record."  *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x

502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is

"more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation

marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Id.* at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability."  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2018).  The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find

3

that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2022); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  The claimant must provide evidence establishing the residual functional capacity, which "is the most

[the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2022).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2022)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 12, PageID.79). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 10, 2019, the alleged onset of disability date. (*Id.* at PageID.68). At step two, the ALJ concluded that Plaintiff had the following severe impairments: tendon and ulnar nerve lacerations of the right wrist, status-post surgical repairs, diabetes mellitus, neuropathy, obesity, tension headaches, bipolar disorder, post-traumatic stress disorder, dissociative personality disorder, and systhmic disorder. (*Id.*) The ALJ found that Plaintiff's coronary artery disease and hypertension were nonsevere impairments. (*Id.*) At step three, the ALJ decided that none of Plaintiff's severe impairments met or medically

equaled a listed impairment.  (*Id.*)  Next, the ALJ determined that Plaintiff had a

residual functioning capacity to perform light work[1] with the following limitations:

> occasional ramps and stairs with a handrail; no ladders/ropes/scaffolds;
> can frequently balance; occasionally stoop, kneel, crouch, and crawl;
> with the right dominate hand, there can be occasional pushing and
> pulling, occasionally use of hand controls, and occasionally handling,
> fingering, and feeling with the right upper extremity; simple, routine,
> repetitive tasks, but not at a production rate pace (e.g. assembly line
> work) involving only simple work related decisions with few, if any,
> workplace changes; occasional contact with the general public and
> coworkers; occasional bilateral foot controls; and a moderate noise and
> light level (e.g. light industrial to office setting).

(ECF No. 12, PageID.70).  At step four, the ALJ found that Plaintiff could not

perform any of his past relevant work.  (*Id.* at PageID.77).  Finally, at step five, the

ALJ found that Plaintiff could work as a "housekeeping/office clean[er]," an

occupation with jobs that existed in significant numbers in the national economy.

(*Id.* at PageID.78).

### E. Background

#### 1.  Medical Evidence

Plaintiff worked as a cook until 2019 when he accidently cut his right wrist,

lacerating his ulnar nerve, an artery, and six of his nine tendons.  (ECF No. 12,

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting
or carrying of objects weighing up to 10 pounds. Even though the weight lifted may
be very little, a job is in this category when it requires a good deal of walking or
standing, or when it involves sitting most of the time with some pushing and pulling
of arm or leg controls."  20 C.F.R. § 404.1567(b) (2021).

PageID.92–98).  Even after three surgeries, Plaintiff did not fully recover from his injury, and lost most of his function in his right hand.  (*Id.* at PageID.98–99). Because he was right-handed, Plaintiff could no longer perform his job as a chef, and his employer let him go just a week after his injury.  (*Id.* at PageID.92, 98).

After his wrist injury, Plaintiff sought surgery to repair his damaged nerves and tendons.  (*Id.* at PageID.685).  However, when Plaintiff attempted to get "preclearance" for the surgery, he learned that his "blood glucose [was] out of control" and that he could not get the surgery until his blood glucose levels improved.  (*Id.*)  For that reason, Plaintiff began treatment with Dr. Christopher Pope, who diagnosed Plaintiff with Type II diabetes.  (*Id.* at PageID.685, 689–90). After Plaintiff's first examination, Dr. Pope noted that while Plaintiff was diabetic, he displayed no "complications" from his diabetes.  (*Id.*)  Moreover, notwithstanding Plaintiff's obesity and high blood sugar, he his physical examination was "normal." (*Id.* at PageID.689).  Plaintiff returned to Dr. Pope for follow-up appointments throughout the next year.  (*Id.* at PageID.693–720).

In December 2020, despite having only ever treated Plaintiff for diabetes, Dr. Pope completed two forms in which he opined on Plaintiff's physical abilities.  (*Id.* at PageID.913–16, 922–25, 931).  Dr. Pope believed that Plaintiff was substantially limited in his functional abilities.  For example, he opined that Plaintiff needed to alternate between sitting and standing at will; that Plaintiff could neither sit, nor

7

stand, for more than four hours total in an eight-hour day; and that Plaintiff could lift no more than ten pounds. (*Id.* at PageID.922–23). He also found that Plaintiff had significantly limited functioning in his legs and both of his arms, and that Plaintiff should avoid "environmental hazards" such as "extreme temperature, humidity, and "vibrations." (*Id.* at PageID.924–25). Although the form asked Dr. Pope to "[i]dentify the particular medical . . . findings which" supported his opinions, Dr. Pope declined to explain how he came to his conclusions, except to say that Plaintiff was limited by his right-hand injury. (*Id.* at PageID.923–25).

### 2. Plaintiff's Testimony at the Administrative hearing

The ALJ began the hearing by examining Plaintiff. (*Id.* at PageID.72). Plaintiff described his wrist injury to the ALJ, explaining that his hand is generally numb and that "it takes [him] a while to" close his hand into a fist. (*Id.* at PageID.99). He also explained that because of his injury, his hand was "weak[]" and he would drop things "all the time." (*Id.*) While Plaintiff still cooked for himself at home, cooking became a much longer process because he would often need to perform tasks with his nondominant hand. (*Id.* at PageID.99–100).

Plaintiff would often feel a "sharp pain" in his right hand. (*Id.* at PageID.103). While he was never in "constant pain," would occasionally feel a sharp, short-lasting pain which he describes as a "nine" on a scale of one through ten. (*Id.*) At other

times, Plaintiff would also occasionally feel a "low[,] dull pain," which, while only moderately painful, tended to "linger[]."  (*Id.* at PageID.103–04).

Plaintiff also testified that he experienced constant pain in his right knee ever since he was stuck by a car when he was eleven years old.  (*Id.* at PageID.104). Plaintiff told the ALJ that he never sought treatment because doctors would only treat his knee through surgery or medication, treatments he wished to avoid due to a past addiction to pharmaceuticals.  (*Id.* at PageID.102–04).  Still, Plaintiff's knee pain did not prevent from dressing, bathing, grocery shopping, or performing household chores.  He could mow his lawn, shovel snow and rake leaves.  (*Id.* at PageID.104–05).  He testified that he could walk for up to five minutes continuously and that he could stand for only an hour at a time because of his diabetic neuropathy. (*Id.* at PageID.106).  Apart from needing to frequently use the restroom, Plaintiff testified that nothing prevented him from sitting for an extended period.   (*Id.* at PageID.106–07).  Plaintiff also told the ALJ that he could use his left hand to lift up to twenty pounds, and that he could climb stairs using a handrail.  (*Id.* at PageID.107–08).

### 3.  The Vocational Expert's Testimony at the Administrative Hearing

After Plaintiff testified, the ALJ questioned the vocational expert ("VE").  (*Id.* at PageID.113).  The ALJ asked the VE to assume a hypothetical person with the same age, educational level, and prior work experience as Plaintiff who could

perform a full range of light work, except that this person was limited to occasional use of ramps and stairs with a handrail. (*Id.* at PageID.115–17). The individual could not climb ladders, roper, or scaffolds; he or she could frequently balance and occasionally stoop, kneel, crouch, or crawl; and, using the "right dominant hand," he or she could occasionally push, pull, and use hand controls. (*Id.*) The hypothetical person could frequently handle objects with his or her right arm but could only use his or her right arm to occasionally finger and feel objects. (*Id.*) Last, the ALJ mentioned that the individual could be exposed to only "moderate" lighting. (*Id.*) The VE replied that the hypothetical person could not perform any of Plaintiff's past work. (*Id.* at PageID.117). However, the hypothetical person could perform housekeeping or office cleaning, Dictionary of Occupational Titles ("DOT") code 323.687-014, approximately 150,000 jobs nationally, or the individual could perform "attendant" work, DOT code 349.667-014, approximately 30,000 jobs nationally. (*Id.* at PageID.117–18).

The ALJ then asked the VE to assume the same person from the prior hypothetical, but to further assume that he or she was limited to "occasional handling, fingering, and feeling with the right dominant hand . . . ." (*Id.* at PageID.118). The VE testified that this individual could perform the same jobs as the individual from the prior hypothetical, and that these jobs would be available in the same quantities. (*Id.*)

10

Next, the ALJ assumed a hypothetical individual with the same restrictions as the person from the second hypothetical, except that this individual would be limited to "simple, routine, repetitive tasks[,] but not at a production rate pace as assembly line work." (*Id.*)  The hypothetical person could only perform work "involving simple work-related decisions with few if any workplace changes and occasional contact with the general public and coworkers." (*Id.*)  The VE explained that while this person could not perform attendant work, he or she could still perform office cleaning and housekeeping.  (*Id.* at PageID.119).

Without specifying which of the prior hypotheticals he was referring to, the ALJ then asked the VE whether any job would be available "if the individual were limited to occasional bilateral foot controls and a moderate noise and light level . . . ."  (*Id.*)  The VE testified that these restrictions would "reduce the number of attendants jobs by about 5,000." (*Id.*)

Next, the ALJ asked whether there would be any jobs available in the national economy for the individual from the prior hypothetical if that person could not be exposed to any "hazards" such as "unprotected heights" or "operational control of dangerous moving machinery," but the individual could "avoid ordinary hazards in the workplace such as boxes on the floor, doors ajar, [or] approaching people or vehicles."  (*Id.*)  The VE testified that these limitations would not affect the amount of work available for this individual.  (*Id.*)

11

Last, the ALJ asked if the hypothetical individual could work as an attendant or a cleaner if he or she would be "off-task [fifteen] percent" of the workday. (*Id.* at PageID.119–20). The VE responded that any worker "must be able to remain on task at least [ninety] percent of the workday besides the standard breaks." (*Id.* at PageID.120).

Before the ALJ finished his examination, he asked the VE whether his testimony was consistent with the DOT. (*Id.*) However, he then clarified that he considered "a number of factors that" were not "fully developed or addressed in the DOT." (*Id.*) These factors included: the use of "stairs with handrails," pushing and pulling, the "utilization of one hand . . . more than the other," contact with the public, assembly line production, "avoidance of ordinary hazards," foot controls, and "time off-task." (*Id.* at PageID.120–21). When considering these factors, the VE explained that he relied on his "[forty-two]-plus years of rehabilitation counseling practice with placement experience with hundreds of people with disabilities" rather than information from the DOT. (*Id.* at PageID.120).

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B) (2018). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable

medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed Psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)   A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a) (2021).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.* § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration ("SSA") "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.* § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical

14

findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.* § 404.1520c(c)(3). This factor will include the analysis of:

(i)    Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)   Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)   Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)    Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.*  The fourth factor of the SSA's analysis is "specialization."  In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty."  *Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors."  These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding."  *Id.* § 404.1520c(c)(5).  "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."  *Id.*  Further, when the SSA considers "a medical source's familiarity

16

with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.* § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

17

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)     Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)     Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.* § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.* § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by

20

the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.* § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs

and laboratory findings), would lead to a conclusion that you are disabled." *Id.* §
404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms,
including pain, we will consider all of the available evidence, including your medical
history, the medical signs and laboratory findings, and statements about how your
symptoms affect you." *Id.* § 404.1529(a).  The SSA clarified that it will "then
determine the extent to which your alleged functional limitations and restrictions due
to pain or other symptoms can reasonably be accepted as consistent with the medical
signs and laboratory findings and other evidence to decide how your symptoms
affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater
severity of impairment than can be shown by objective medical evidence alone, we
will carefully consider any other information you may submit about your
symptoms." *Id.* § 404.1529(c)(3).  This other information may include "[t]he
information that your medical sources or nonmedical sources provide about your
pain or other symptoms (e.g., what may precipitate or aggravate your symptoms,
what medications, treatments or other methods you use to alleviate them, and how
the symptoms may affect your pattern of daily living)," which "is also an important
indicator of the intensity and persistence of your symptoms." *Id.*

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason,

23

we will not find you disabled or, if you are already receiving benefits, we will stop

paying you benefits." *Id.* § 404.1530(b).  Acceptable (or "good") reasons for failure

to follow prescribed treatment include:

> (1)    The specific medical treatment is contrary to the established teaching and tenets of your religion;
>
> (2)    The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;
>
> (3)    Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;
>
> (4)    The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or
>
> (5)    The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* § 404.1530(c).

### G. Arguments and Analysis

### 1.    Whether the ALJ Properly Discounted Dr. Pope's Opinions

Plaintiff first argues that that the ALJ erroneously discounted a pair of medical

statements submitted by one of Plaintiff's physicians, Dr. Pope.  In his statements,

Dr. Pope opined that Plaintiff would be off task for fifteen percent of the workday

and absent at least four times per month.  (ECF No. 12, PageID.913, 922).  He also

found that Plaintiff's abilities to lift and use his hands were significantly limited.  For

example, he opined that Plaintiff could "occasionally" lift fewer than ten pounds, "rarely" lift ten pounds, and "never" lift more than twenty pounds. (*Id.* at PageID.923). He also believed that Plaintiff could only occasionally use his hands to reach, handle, finger, feel, push, or pull, except that he could "rarely" reach his right arm in all directions besides overhead. (*Id.* at PageID.924).

Dr. Pope further opined that Plaintiff's use of his legs was significantly limited. Specifically, Dr. Pope believed that Plaintiff could rarely use foot controls, climb ladders, stoop, or crouch; occasionally climb stairs, balance, or kneel; and never crawl. (*Id.* at PageID.925). He noted that Plaintiff needed to alternate between sitting and standing at will, and that Plaintiff could neither sit, nor stand, for more than four hours total in an eight-hour day. (*Id.*) Dr. Pope concluded his most recent statement by mentioning that Plaintiff could rarely be exposed to environmental hazards such as unprotected heights, extreme temperature, vibrations, or dust. (*Id.*)

But the ALJ found that most of Dr. Pope's opinions were "not persuasive" and adopted a modestly less restrictive RFC. (*Id.* at PageID.70, 76–77). For example, while Dr. Pope found that Plaintiff could lift up to ten pounds, the ALJ found that Plaintiff could lift up to twenty pounds. (*Id.* at PageID.70). Further, the ALJ agreed with Dr. Pope that Plaintiff had postural and manipulative limitations, but unlike Dr. Pope, the ALJ believed that Plaintiff was only limited to frequent postural activities and that only Plaintiff's right hand was limited. (*Id.*) And, while the ALJ disagreed

that Plaintiff had limitations in sitting and standing, the ALJ agreed with Dr. Pope that Plaintiff could only occasionally climb stairs, and he even imposed a greater restriction than Dr. Pope on Plaintiff's ability to climb ladders. (*Id.*)

As discussed above, an ALJ must consider all medical opinions and explain how persuasive he or she found the opinions of each medical source. 20 C.F.R. § 404.1520c(a)–(b)(1) (2021). An ALJ may not "defer or give any specific evidentiary weight, including controlling weight" to any medical source—it is the ALJ's responsibility to freely weigh each medical opinion. 20 C.F.R. § 404.1520c(a)–(b)(1). When considering the persuasiveness of a medical opinion, an ALJ must consider (1) how well the opinion is supported by objective evidence and the medical source's explanations, (2) the opinion's consistency with the entire record, (3) the source's "[r]elationship with the claimant," (4) the specialization of the medical source, and (5) any other factor that may "support or contradict" the medical opinion. *Id.* § 404.1520c(c).

The regulations explain that "supportability" and "consistency" are the most important of these factors. *Id.* § 404.1520c(b)(2). Accordingly, an ALJ need only discuss these two factors in his or her decision. *Id.* Further, where a medical source opines on multiple functional abilities, the ALJ need not discuss each opinion individually; rather, the ALJ need only discuss the medical source's opinions as a whole, "using the [applicable] factors . . . as appropriate." *Id.* § 404.1520c(a). The

ALJ's discussion must be detailed enough to allow a reviewing court "to determine whether" the ALJ's decision "was supported by substantial evidence." *Hardy v. Comm'r of Soc. Sec.*, 20-10918, 2021 WL 3702170, at *4 (E.D. Mich. Aug. 13, 2021) (quotation marks omitted) (quoting *Vaughn v. Comm'r of Soc. Sec.*, No. 20-1119, 2021 WL 3056108, at *11 (W.D. Tenn. July 20, 2021)).

Plaintiff argues that the ALJ "failed altogether to articulate the supportability and consistency of" Dr. Pope's opinions and that the Court should remand so that the ALJ can issue a new decision which articulates how he considered these two factors. (ECF No. 14, PageID.956). However, the ALJ did discuss both factors at length in his decision, noting that Dr. Pope not only failed to cite any relevant, "objective evidence" in support of his findings, but that Dr. Pope's opinions also contradicted the "overall record." (ECF No. 12, PageID.76–77); *see* 20 C.F.R. § 404.1520c(c)(1)–(2). And curiously, despite arguing that the ALJ did not articulate how he considered supportability and consistency, Plaintiff quotes a portion of the decision where the ALJ discusses the consistency of Dr. Pope's opinions with the overall record. (ECF No. 14, PageID.956).

Perhaps what Plaintiff means to argue is that while the ALJ discussed supportability and consistency, these discussions were not supported by substantial evidence. But this argument, too, lacks merit.

First, the ALJ reasonably found that most of Dr. Pope's opinions were not well

supported.  The form Dr. Pope used to fill out his medical source statements asked him to list "the particular medical or clinical findings which support" his opinions. (ECF No. 12, PageID.914–16, 923–25).  However, Dr. Pope did not list any medical findings in support of his opinions regarding Plaintiff's use of his hands, his postural abilities, or his tolerance for environmental hazards.  (*Id.*)

Dr. Pope did provide objective support for his opinions regarding Plaintiff's ability to sit and stand.  He explained that because Plaintiff had an "inability to extend and close [his] right hand" due to "extreme weakness and numbness" in that hand, Plaintiff needed freely alternate between sitting and standing and he could neither sit nor stand for more than four hours per day.  (*Id.* at PageID.914, 923). Understandably, the ALJ did not see how a "hand injury" could affect Plaintiff's "ability to sit, stand, or walk."  (*Id.* at PageID.76).

Finding little to no internal support in Dr. Pope's medical statements, the ALJ looked to Dr. Pope's treatments notes.  (*Id.* at PageID.76); *see McMillen v. Comm'r of Soc. Sec.*, No. 20-cv-2531, 2022 WL 1215495, at *11–13 (N.D. Ohio Mar. 11, 2022) (recognizing that a medical source's opinion may be supported by his or her treatment notes).  But there too, the ALJ found little support for Dr. Pope's substantial restrictions.  Indeed, The ALJ noted that Dr. Pope's physical examinations of Plaintiff "were generally unremarkable, but for obesity."  (ECF No. 12, PageID.76).

28

The ALJ also relied on substantial evidence in finding that Dr. Pope's opinions were inconsistent with the rest record. For example, while Dr. Pope believed that Plaintiff could lift no more than ten pounds, Plaintiff testified that he could lift up to twenty pounds with his left hand. (*Id.* at PageID.76, 107–08, 914, 923). And while Dr. Pope opined that Plaintiff had limited use of both arms, the record contains no evidence of any limitations in Plaintiff's left arm and hand. (*Id.* at PageID.76). Moreover, apart from a single examination in March 2019, the ALJ found that the record contained no evidence that Plaintiff's diabetic neuropathy caused any sensory deficits in her feet. (*Id.* at PageID.76, 479).

Although the ALJ need not have done so, he also discussed most of the remaining factors under § 404.1520c.[2]  First, the ALJ discussed Dr. Pope's relationship with Plaintiff at length, detailing Plaintiff's treatment history from their first to most recent meeting. (ECF No. 12, PageID.72–77). While Dr. Pope treated

---

[2] Citing 20 C.F.R. § 404.1520c(b)(3), Plaintiff argues that because Dr. Pope's opinions and the opinions from the state consultants are inconsistent with each other, but equally well supported and equally consistent with the record, the ALJ was required, yet failed, to articulate how he considered the remaining factors. (ECF No. 1, PageID.956–57). Under § 404.1520c, when an ALJ who finds that two or more conflicting medical opinions or prior administrative medical findings are equally supported and equally consistent with the record as a whole, the ALJ must articulate how he or she considered the remaining factors. However, Plaintiff ignores that this rule only applies where the ALJ "*finds*" that two conflicting sources are equally persuasive. 20 C.F.R. § 404.1520c(b)(3). Because the ALJ found that Dr. Pope's opinions were less persuasive than the state consultants, he need not have articulated how he considered any factors beyond consistency and supportability. *Cf. McClain v. Saul*, No. 1:20-cv-00111, 2021 WL 918761, at *3 (W.D. Ky. Mar. 10, 2021).

Plaintiff for several months, the ALJ mentioned that Dr. Pope only treated Plaintiff for diabetes, implying that his treatment history with Plaintiff had little relevance to the opinions in his medical source statements. (*Id.* at PageID.76, 684–718). Moreover, although the ALJ did not explicitly discuss specialization under § 404.1520c(4), Dr. Pope appears to be a family doctor, and not a specialist in any area of medicine. (*See id.* at PageID.684–718). Accordingly, I suggest that the ALJ relied on substantial evidence in discounting Dr. Pope's opinions.

### 2.    Whether the VE's Testimony Was Consistent with the DOT

Plaintiff also argues that the ALJ did not rely on substantial evidence when finding that Plaintiff could work as a "housekeeper" at step five because he failed to resolve a conflict between the VE's testimony and the DOT. At the hearing, the VE testified that a hypothetical individual with the same RFC as Plaintiff could work as a housekeeper; however, while the ALJ stated that the hypothetical individual could only use his right than to handle, finger, push, and pull for up to one-third of the workday, the DOT explains that a housekeeper must handle objects, with both hands, anywhere between one-third and two-thirds of the workday. *Compare* (ECF No. 12, PageID.116–19), *with Dictionary of Occupational Titles* 323.687-014 (4th ed. 1991).

At step five of the sequential analysis, the Commissioner carries the burden of proving that a claimant can perform a significant number of jobs in the national economy. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002). And,

if the ALJ presents a hypothetical that "accurately portrays" the claimant's functional abilities to the VE, then the ALJ can rely on a VE's testimony that the claimant can perform specific jobs to determine that the claimant can adjust to other work in the national economy. *Varley v. Sec'y of Health & Hum. Servs.*, 820 F.2d 777, 779 (6th Cir. 1987); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013).

A VE's testimony "generally should be consistent with the occupational information supplied by the DOT." SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000). But VEs are not bound by the DOT—the DOT's descriptions of occupations "are merely advisory. . . ." *Wright v. Massaneri*, 321 F.3d 611, 616 (6th Cir. 2003); *see also Warf v. Shalala*, 844 F. Supp. 285, 289 (W.D. Va. 1994).

Accordingly, where a VE's testimony conflicts with the DOT, neither the DOT nor the VE evidence "automatically 'trumps'" the other—it is up to the ALJ to resolve this conflict. SSR 00-4p, 2000 WL 1898704, at *2. The ALJ has an affirmative duty to ask the VE whether his or her testimony conflicts with the DOT. *Id.* at *4. If the VE's testimony "appears to conflict with the DOT," then the ALJ must "obtain a reasonable explanation for the apparent conflict" before relying on the VE's testimony. *Id.* In the Sixth Circuit, only conflicts which are identified by the VE are "apparent"—the ALJ has no independent duty to inspect the DOT for possible conflicts. *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374; *see*

31

*Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009).[3]  A VE's belief, based on his or her "experience in job placement or career counseling," that the DOT does not accurately describe a particular job's requirements, constitutes a "reasonable explanation."  SSR 00-4p, 2000 WL 1898704, at *2.

Here, after the VE testified that a hypothetical individual with Plaintiff's RFC could work as a housekeeper, the ALJ asked him whether his testimony was "consistent with the [DOT]."  (ECF No. 12, PageID.120).  The VE initially responded that his testimony was "not inconsistent"; however, he immediately walked this statement back, clarifying that because the DOT does not address the use of "one hand . . . more than the other," he relied on his forty-two years of experience in "rehabilitation counseling" when analyzing the impact of these functional limitations.  (*Id.* at PageID.120–21).

The parties do not dispute that by acknowledging that his testimony differed from the DOT, the VE raised an apparent conflict between the VE's testimony and the DOT.  *See Lindsley*, 560 F.3d at 606.  Thus, for the ALJ to have properly relied

---

[3] This differs from the approach taken in many other circuits which hold that all discrepancies between a VE's testimony and the DOT are "apparent."  *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1362–65 (11th Cir. 2018) (recognizing a split between the Sixth Circuit and the Fourth, Seventh, Eighth, Tenth, and Eleventh Circuits).  In these circuits, ALJs must independently review the DOT and resolve any conflicts, including that are including those that were not acknowledged by the VE.  *See, e.g.*, *Thomas v. Berryhill*, 916 F.3d 307, 313 (4th Cir. 2019); *Washington*, 906 F.3d at 1362–65.

on the VE's testimony, the VE must have provided a reasonable explanation for this apparent conflict.

I suggest that the VE provided a reasonable explanation for why he found that the hypothetical person could work as a housekeeper despite not being able to occasionally handle objects with both hands. When the DOT refers to functional abilities such as reaching, handling, or fingering, it assumes that a claimant can use both arms equally. But the ALJ's hypothetical presented a situation where the claimant had different abilities in each arm. *See Dictionary of Occupational Titles*, *supra*, at 323.687-014. And, under the ALJ's hypothetical, one of the claimant's arms exceeded the minimum requirements for the position, while the other fell slightly below. (ECF No. 12, PageID.116). Under these circumstances, the DOT provides no clear guidance—although it assumes that a claimants do not have imbalances in their extremities, it does not state that the use of *both* hands, occasionally, is essential, or that an individual cannot compensate for one deficient arm by relying more on the other. *See Dictionary of Occupational Titles*, *supra*, at 323.687-014. Thus, to address a hypothetical where a claimant's functional abilities that were different in each arm, the VE had to draw from his personal experience, rather than the DOT. Although his testimony could have been clearer, the VE apparently believed that Plaintiff's unlimited use of his left hand could compensate for his slightly deficient right hand. (*See* ECF No. 12, PageID.116). Accordingly, I

suggest that the ALJ properly resolved this apparent conflict and supported his step five finding with substantial evidence relying on the VE's testimony. *Cf. Parr v. Comm'r of Soc. Sec.*, 2021 WL 5986920, at *16 (E.D. Mich. Aug. 31, 2021), *report & recommendation adopted by* 2021 WL 5370483 (E.D. Mich. Nov. 18, 2021).

### 3.    Separation of Powers

Last, Plaintiff argues that the Commissioner's final decision was invalid because the Social Security Act unconstitutionally prohibits the President from removing the Commissioner except for "neglect of duty or malfeasance in office." 42 U.S.C. § 902(a)(3) (2018).  According to Plaintiff, this unconstitutional provision deprived the Commissioner of his authority to carry out the duties of his office, and because the ALJ's authority to render the final decision in Plaintiff's case was "delegated from the Commissioner," the ALJ, too, lacked authority to adjudicate Plaintiff's claim.  (ECF No. 14, PageID.959).  To remedy this constitutional violation, Plaintiff asks that the Court remand this matter to the SSA for a new hearing under the leadership of a Commissioner who is not protected by this unconstitutional statute.  (*See id.* at PageID.960).

There is no question that 42 U.S.C. § 902(a)(3) unconstitutionally restricts the President's removal powers.  The constitution vests the executive power of the United States in the President, whom it trusts to "take care that the laws" of the United States "be faithfully executed."  U.S. Const. art II, § 1, cl. 1; *id.* § 3.  Inherent

in this responsibility is the power for the President to delegate his authority and remove officers so that he can "maintain a degree of control over [his] subordinates." *Collins v. Yellen*, 141 S. Ct. 1761, 1784 (2021). At the same time, however, the "Necessary and Proper Clause grants Congress broad authority to create the positions that executive officers occupy and to structure those offices as Congress believes best to achieve its goals." Constitutionality of the Comm'r of Soc. Sec.'s Tenure Protection, 45 Op. OLC ___, 2021 WL 2981542, at *3 (July 8, 2021) (citing *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2224–25, 2229–33 (2020) (Kagan, J., dissenting)).

To resolve this tension between the powers of Congress and the Executive, the Supreme Court has explained that Congress may only restrict the President's power to remove two types of officials: "*inferior* officers with narrowly defined duties" and officials belonging to "a *group* of principal officers." *Seila Law*, 140 S. Ct. at 2192. Applying this rule, the Court held in *Collins v. Yellen* that a prohibition on a president's ability to remove the head of "an agency led by a single director," without good cause, violates the separation of powers, regardless of the degree or "importance of the" agency's "regulatory and enforcement authority." 141 S. Ct. at 1783–85; *see also id.* at 1800–01 (Kagan, J., concurring). Like the statute at issue in *Collins*, § 902(a)(3) restricts the President's power to remove the single head of an agency, except for good cause. *Compare id.* at 1783–85, *with* 42 U.S.C. §

35

902(a)(3).  And for that reason, there is widespread agreement that under *Collins*, §

902(a)(3) violates the separation of powers.  *See, e.g.*, *Collins*, 141 S. Ct. 1761, at

1802 (Kagan, J. concurring); OP. OLC, 2021 WL 2981542, at *11; *Rhonda W. v.

Comm'r of Soc. Sec.*, No. 2:20-cv-5931, 2022 WL 390802, at *6–7 (S.D. Ohio, Feb.

9, 2022).

Unsurprisingly, then, neither party disputes that § 902(a)(3) is

unconstitutional.  What they dispute, rather, is the proper remedy for this

constitutional deficiency.  Plaintiff asks the Court to remand this matter to the

Administration, arguing that not only is this unconstitutional statute void, but that it

also stripped the former Commissioner, Andrew Saul, of any authority to issue the

final decision.  The Commissioner, on the other hand, argues that the Court need not

remand because not only did Andrew Saul retain his authority despite the

unconstitutional removal provision, but because Plaintiff also cannot show how he

was prejudiced by the President's inability to remove Saul.

The Supreme Court's decision in *Collins* supports the Commissioner's

assertion that unconstitutional removal provisions do not strip officials of their

authority, and it leaves little room for debate. 141 S. Ct. at 1787–88 & n.23.  Though

Plaintiff asserts otherwise, a restriction on a president's removal power is not a

"delegation of authority."  *See id.*  Authority is delegated when an agency head is

appointed, and a removal restrictions simply limits the circumstances under which

that already existing delegation of authority may be revoked. *See id.* Thus, unlike an unconstitutional appointment, an unconstitutional removal provision does not affect an agency head's "authority to carry out the functions of the office." *Id.* Although the removal provision here violated the separation of powers, the Commissioner was still "properly *appointed*" and authorized to carry out his duties. *Id.*

Moreover, the Court need not find the entire Social Security Act unconstitutional just because the removal provision in § 902(a)(3) violates the separation of powers. It is well established that "one section of a statute may be repugnant to the Constitution without rendering the whole act void." *Seila Law*, 140 S. Ct. at 2208 (internal quotation marks omitted) (quoting *Loeb v. Columbia Township Trustees*, 179 U.S. 472, 490 (1900)). For that reason, when a court confronts a constitutional flaw in a statute, the scope of its solution should not exceed the problem: the court must sever "only the problematic portions while leaving the remainder" of the statute "intact." *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010). But this can only be done if severance of the unconstitutional provision would be consistent with Congress's intent. *Seila Law*, 140 S. Ct. at 2209. If severing the repugnant provision would leave behind a statute "that Congress would not have enacted," then the court must

strike down the entire statute. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987); *see also Loeb*, 179 U.S. at 490.

Here, the Court need not wonder whether Congress would have enacted the Social Security Act if it felt it could not have protected the Commissioner from removal: the Act provides that "[i]f any provision . . . is held invalid, the remainder of of the [Act] . . . shall not be affected thereby."   42 U.S.C. § 1303 (2018); *see Alaska Airlines*, 480 U.S. at 686.  This clause creates a "strong presumption that Congress did not intend the validity of the" Social Security Act "to depend on the validity of" the removal provision. *Alaska Airlines*, 480 U.S. at 686.

There is nothing in the Act that would overcome this presumption.  The undersigned doubts that Congress would have preferred no Social Security Administration at all to an Administration with a commissioner who could be removed at will. *See Free Enterprise Fund*, 561 U.S. at 509.  Indeed, because none of the Act's provisions "depend[] on the Commissioner's statutory protection from removal," the Administration's "structure and duties [would] remain fully operative without the offending tenure provision.  OP. OLC, 2021 WL 2981542, at *10 (internal quotation marks omitted) (quoting *Seila Law*, 140 S. Ct. at 2209).  Moreover, nothing "in the text or history of the statute" indicates that Congress would not prefer that the removal provision be severed. *Seila Law*, 140 S. Ct. at 2209.  Quite the opposite, "for most of the SSA's history, the entity was headed by

an individual or individuals who did not enjoy tenure protection." OP. OLC, 2021 WL 2981542, at *10. Although Congress enacted the removal clause "out of frustration with the [Administration's] performance," it is doubtful that "Congress believed the next-best solution was to dismantle the" Administration altogether. *Id.*

Because the Commissioner still retains authority to carry out the duties of his office, and because the rest of the Social Security Act can be severed from the removal provision, the *only* effects of this separation of powers violation are that § 902(a)(3) is void and that the President can remove the head of the SSA without cause, nothing more.

But this does not mean that an unconstitutional removal provision can never "inflict compensable harm" on a plaintiff. *Collins*, 141 S. Ct. at 1788–89. There may be situations where the president's inability to terminate an officer leads an agency to reach a final decision that is adverse to some party, and "[o]nly" in these situations, where "the President's inability to fire an agency head affected the complained-of decision," would a party be entitled to relief. *Id.*; *id.* at 1801 (Kagan, J., concurring).

Thus, to obtain relief for an unconstitutional removal challenge, a plaintiff must show that "official[] subject to the challenged removal restriction[]" caused "the alleged injuries, and" that the removal restriction, itself, "caused 'compensable harm' upon" the plaintiff. *Stamm v. Kijakazi*, No. 3:20-cv-02273, ___ F. Supp. 3d

39

___, 2021 WL 6197749, at *6 (M.D. Pa. Dec. 31, 2021) (quoting *Collins*, 141 S. Ct. at 1789).   In *Collins*, for example, the director of the Federal Housing Finance Agency ("FHFA") appointed the FHFA as the conservator of two private mortgage companies and entered these companies into a financial agreement with the U.S. Treasury.   *Collins*, 141 S. Ct. at 1172.   This agreement required the companies to sell shares to the treasury and pay the treasury annual dividends.   *Id.* at 1172–73. The director later amended the agreement to change the amount of the dividends the companies owed the treasury each year, and a group of shareholders sued the Treasury, arguing that the FHFA's structure was unconstitutional because the director could only be removed by the president for cause.   *Id.* at 1173–75.

Although the Court disagreed that the structure of the entire FHFA was unconstitutional, the Court agreed that the director was protected by an unconstitutional removal provision, and it reasoned that because the director was involved in both the agreement and its amendment, it was possible that the removal provision could have injured the shareholders.   *Id.* at 1783–84, 1787–89.   The Court explained that if a president wished to remove the director, but believed that he could not do so because of the removal provision, then this would "clearly cause harm." *Id.* at 1789.   Or, if the President attempted to remove a director, but was prevented from doing so by a lower court that believed he lacked "cause for removal," then this too would have caused harm.   *Id.*; *see also Decker Coal Co. v. Pehringer*, 8

40

F.4th 1137–38 (9th Cir. 2021) (explaining that a plaintiff must show that the existence of a for-cause removal restriction "*alone* tainted the ALJ's decision").

Here, however, Plaintiff does not show how the unconstitutional removal provision in § 902(a)(3) affected the ALJ's decision. Even if the removal provision prevented either President Biden or President Trump from replacing the Commissioner before the ALJ issued his decision,[4] it is unlikely that his replacement would have affected the ALJ's decision. Commissioner Saul was neither aware of, nor directly involved in, Plaintiff's claim: the ALJ, and the ALJ alone, issued the

---

[4] Although there is no indication that President Trump intended to replace Commissioner Saul, his own appointee, there is reason to believe that President Biden waited until July 2021 to remove Commissioner Saul because, prior to *Collins*, he did not believe he had the power to remove the Commissioner without cause. Indeed, just fifteen days after the Court issued its decision in *Collins*, the Office of Legal Counsel wrote a memorandum in which it concluded that under *Collins*, the Social Security Act's for-cause removal provision was unconstitutional, and the President could remove Andrew Saul from office. *Compare Collins*, 141 S. Ct. at 1761, *with* OP. OLC, 2021 WL 2981542, at *11. President Biden removed Commissioner Saul the day after the Office of Legal Counsel issued the memorandum, accusing Commissioner Saul of "undermin[ing] and politiciz[ing] the Administration. *Kwasnik v. Kijakazi*, No. 3:21-cv-08573, 2022 WL 2358424, at *11 (D.N.J. June 30, 2022) (internal quotation marks omitted) (quoting Lisa Rein, *Biden Fires Head of Social Security Administration, a Trump Holdover who Drew the Ire of Democrats*, Washington Post (July 11, 2021), https://www.washingtonpost.com/politics/andrew-saul-social-security-/2021/07/09/c18a34fa-df99-11eb-a501-0e69b5d012e5_story.html). However, the ALJ here issued his decision just two weeks after President Biden's inauguration, and it is not clear that President Biden would have removed the Commissioner so soon after taking office, even if he believed that he had the power to do so. *See id.* at *11 ("The Court cannot speculate as to what President Biden *may* have done upon taking office to remove Commissioner Saul."); (ECF No. 12, PageID.62).

final decision. *See Taffe v. Kijakazi*, No. 20-CV-1974-WVG, 2022 WL 542884, at *11 (S.D. Cal. Feb. 22, 2022); *Stamm*, 2021 WL 6197749, at *7. Moreover, the ALJ worked for the SSA long before Commissioner Saul took office, and there is no reason to believe that he would have been removed from office had Commissioner Saul been replaced. *See Federal Employee Profile — David A. Mason*, FederalPay.org, https://www.federalpay.org/employees/social-security-administration/mason-david-a (last visited July 18, 2022).

Indeed, it seems unlikely that *any* unsuccessful social security claimant could show that § 902(a)(3) affected their denial. The Commissioner has no direct involvement in the millions of claims before the Administration each year, all of which are adjudicated by employees and officials of the Administration. *See Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795, 803 (1999), *Miaolino v. Comm'r of Soc. Sec.*, No. 2:18-cv-494-Ftm-UAM, 2019 WL 2724020, at *7 (M.D. Fla. July 1, 2019). And while it is possible that the appointment of a new Commissioner could lead to the promulgation of new regulations, the Court can do no more than speculate as to what these new regulations might have been, how they may have affected a particular claim, or whether they would have been promulgated before the Administration issued its final decision. *See Calcutt v. FDIC*, 37 F.4th 293, 317 (6th Cir. 2022) ("The *Collins* Court was not deterred from its holding by the very possibility that harm might occur; rather, it indicated that a more concrete

showing was needed.").    For these reasons, Plaintiff "cannot show how the President's supposed inability to remove the Commissioner without cause might have affected any ALJ's disability benefits decision, much less the decision on his specific claim." *Stamm*, 2021 WL 6197749, at \*7.  Accordingly, I suggest that because Plaintiff cannot show how § 902(a)(3) affected his claim, he fails to demonstrate any "compensable harm," and the Court cannot remand the decision on this ground.

### H.    Conclusion

For the previously discussed reasons, I conclude that substantial evidence supports the ALJ's decision.  Consequently, I recommend **DENYING** Plaintiff's Motion, (ECF No. 14), **GRANTING** the Commissioner's Motion (ECF No. 16), and affirming the decision.

## III.    REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human*

*Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: July 19, 2022

S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge

44